Jeffrey K. Rubin (AK Bar # 8206061)
Friedman | Rubin
1227 West 9th Ave., Suite 301
Anchorage, AK 99501
Ph: 907-258-0704
Fax: 907-278-6449
e-mail: jrubin@friedmanrubin.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

STEPHAN RAMSEYER, Personal Representative for the Estate of Beat Niederer and on behalf of Sabine Niederer (Spouse), and M. N. and A. N. (minor children), heirs and descendants of Beat Niederer, deceased,

Plaintiffs,

vs.

MOUNTAIN TRIP INTERNATIONAL, LLC, a Limited Liability Company, and MOUNTAIN TRIP, INC.

Defendant.

Case No.:

COMPLAINT FOR DAMAGES
(JURY TRIAL DEMANDED)

COMES NOW plaintiff, Stephan Ramseyer, personal representative of the Estate of Beat Niederer and attorney in fact for Sabine Niederer, M. N., and A. N., heirs and descendants of Beat Niederer, deceased, and alleges as follows:

PARTIES, JURISDICTION AND VENUE

1. Stephan Ramseyer is a citizen of Switzerland and is the personal representative of the Estate of Beat Niederer, having received letters of appointment on February 7, 2013 which are attached hereto as Exhibit 1. Beat Niederer was a Swiss citizen who died on May 12, 2011 on Mt. McKinley in Denali National Park, Alaska. At all times relevant hereto Beat Niederer was a Swiss citizen and resident of St. Gallen, Switzerland.

*Estate of Niederer v. Mountain Trip Int'l, LLC,*
Case No. A13-_____  1

2. Sabine Niederer aged 40, was the spouse of Beat Niederer. Sabine Niederer is a Swiss citizen and at all times relevant hereto has maintained her residency in St. Gallen, Switzerland. Sabine Niederer is the mother of M. N. and A. N., minor children, whose father was Beat Niederer.

3. M. N. is the son of Beat Niederer and Sabine Niederer. M. N., aged 10, is a Swiss citizen and at all times relevant hereto has been a resident of St. Gallen, Switzerland.

4. A. N. is the daughter of Beat Niederer and Sabine Niederer. A. N., aged 7, is a Swiss citizen and at all times relevant hereto has been a resident of St. Gallen, Switzerland.

5. Pursuant to an order of the Swiss civil authorities/court, Sabine Niederer, M. N. and A. N. are the sole heirs of Beat Niederer.

6. Defendant Mountain Trip International LLC is a Limited Liability Company. Mountain Trip International, LLC owns defendant Mountain Trip, Inc., an entity licensed to do business and doing business within the State of Alaska including within the Third Judicial District, State of Alaska. Mountain Trip, Inc. provides mountaineering guiding services on Mt. McKinley, in Denali National Park pursuant to Concession Contract No. CC-DENA006-004 with the National Park Service, an agency of the United States Department of the Interior. The relationship of Mountain Trip International, LLC and Mountain Trip, Inc. is such that Mountain Trip International, LLC and Mountain Trip, Inc., should be treated as a single enterprise or as alter egos of one another. Throughout this Complaint, Mountain Trip International, LLC and Mountain Trip, Inc. are referred to as Mountain Trip.

7. Beat Niederer died on Mt. McKinley and pursuant to the death certificate issued by the State of Alaska the place of death was more particularly located as the West Buttress, Talkeetna, Alaska. Talkeetna, Alaska is within the Third Judicial District, State of Alaska.

8. The amount in controversy is in excess of $75,000.00 and this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

## FACTS

9. Beat Niederer was born on October 27, 1972. On December 21, 2001 Beat Niederer was married to Sabine Niederer. M. N. and A. N. are the children of Beat and Sabine Niederer.

1    10. On or about February 14, 2011, Beat Niederer applied to Mountain Trip to
2 participate on a Mountain Trip expedition to Mt. McKinley. The expedition Niederer made
3 application to join was scheduled to attempt to climb Mr. McKinley between April 24 and May
4 17, 2011.

5    11. On February 18, 2011, Niederer tendered payment for participation in the expedition.
6 Payment was made to Mountain Trip International.

7    12. While Niederer had climbing experience first gained through military training, he
8 had never before climbed in an Arctic environment and never at altitudes significantly above
9 14,000 feet.

10    13. Generally, the Mt. McKinley climbing season begins on May 1 of each year and
11 extends into July. The trip that Niederer applied to be a member of, and upon which he was
12 accepted, was an early season trip in which expedition members would gather in Anchorage,
13 Alaska on April 24, 2011, finalize preparations and then depart for the mountain, driving first to
14 Talkeetna, Alaska and then flying from Talkeetna to the Kahiltna Glacier. The expedition that
15 Niederer paid to join was denominated MT-2-Staeheli (hereafter referenced as MT-2, as it
16 constituted the second Mountain Trip Mt. McKinley expedition of the 2011 climbing season and
17 was led by Mountain Trip lead guide, David Staeheli. The expedition arrived on the Kahiltna
18 Glacier to begin its climb on April 25, 2011.

19    14. Early season trips are known to encounter colder temperatures and higher wind
20 speeds at upper elevations of Mt. McKinley than later in the climbing season. As reflected in
21 materials provided to Niederer by Mountain Trip, wind speeds of over 100 mph and
22 temperatures as low as 40 degrees Fahrenheit below zero may be encountered on the upper
23 reaches of the mountain in May and June.

24    15. Mountain Trip is knowledgeable about the extreme weather that can occur on Mt.
25 McKinley in late April and May. Mountain Trip also knows that its primary duty is to keep its
26 clients safe. According to Mountain Trip:

27    The safety of the clients and guides is our number one priority! Risks will
28    not be taken just to get to the summit. The guides will do their best to

attain the summit, but not when the group's safety is compromised. The whole experience and safety are what is most important.

Mountain Trip Operating Plan, Supplement to Concession Contract DENA006-04 § C. Operational Safety.

16. Because of extreme hazards that may be found on Mount McKinley including risks of falls, crevasses, extreme weather and avalanches, Mountain Trip's concession agreement prohibits its guided expeditions from traveling unroped except in limited terrain and in limited camp areas. Guides and clients must be roped for safety at all other times. Because of the hazards and extreme conditions that may be found on Mt. McKinley, Mountain Trip's concession agreement prohibits it from leaving clients unattended whether in camp or while traveling. Because of the danger to which clients may unwittingly expose themselves, Mountain Trip's concession agreement even prohibits it from leaving a client in camp unattended by a guide. All guides are required to carry and know how to use communication devices.

17. All the actions and decisions of Mountain Trip's lead guide and assistant guide described herein were undertaken within the course and scope of their employment by Mountain Trip and Mountain Trip is responsible for the conduct and decisions of its lead guide and assistant guides.

18. As a lead guide on a Mountain Trip expedition, David Staeheli was invested with the stature and authority to exercise control, discretion and independent judgment with respect to the expedition, including to set policy with respect to whether to make a summit attempt, when a summit attempt would be made, the participants in a summit attempt, whether an attempt would be aborted before the summit was achieved, the selection of equipment to be brought on a summit attempt and the manner that it would be distributed among the summit party.

19. In the event of an accident or other emergency on Mount McKinley, rescue in a timely fashion through outside assistance is difficult if not impossible. As elevation increases, the availability of assistance from outside sources decreases. Earlier in the climbing season, when there are fewer parties on the mountain, the availability to obtain outside assistance in the

event of emergency requiring rescue assistance is even more limited. As Mountain Trip is aware:

> A climbing party high on Denali [Mt. McKinley] or other Arctic mountains cannot depend on any assistance in the event of an emergency.
>
> … For all practical purposes, a climbing party is alone and must depend upon its own resources if an emergency situation arises.

Denali Mountaineering Handbook at 17. In operating trips beginning in late April as it does, Mountain Trip is aware of and promotes the fact that there are fewer climbers on the mountain. Accordingly, Mountain Trip knew that it could not rely on the presence of others to assist its climbers in the event of an emergency.

20. Mountain Trip's concession contract with the National Park Service recognizes that a climbing party is dependent on its own resources should it be placed in a survival situation. The Park Service requires each Mountain Trip summit rope team carry certain minimum levels of equipment to reduce risk and increase the chance of surviving in the event of an emergency. Such minimum equipment is required to be carried by each summit rope team to the summit of Mount McKinley. For the 2011 climbing season, each summit rope team was required to carry an ensolite pad, which can be used to either insulate an injured or stranded climber from the snow or splint a broken limb; a sleeping bag or bivouac sack, for insulation and weather protection; a spade or shovel to dig snow caves or other shelter; a snow saw for cutting hardened snow into bricks for shelter; a pot stove and fuel to generate hot liquids or a thermos of hot drink; a communications device and a medical kit.

21. While guides have certain options as to how to fulfill the minimum survival equipment requirements, *e.g.*, bivouac sack vs. sleeping bag and thermos vs. stove, pot and fuel, a guide's choice must be reasonable and prudent under the circumstances including time of year, conditions on the mountain, current and forecast weather, number of parties on the mountain available to assist, and the size, strength and speed of the rope team.

22. A guide's responsibility for protecting the safety of clients extends to both climbing up a peak and descending it as well. A substantial number of mountaineering accidents leading

to fatalities occur on the descents of climbs due to a variety of factors including fatigue, cold, and the desire to avoid bad weather conditions, either existent or impending. The risk of such incidents may increase with elevation due to hypoxia. On Denali, between 1903 and 2006 sixty-one percent of accidents resulting in fatalities occurred on the descent. High Alt. Med. Biology 2008, Spring 9(1): 89-95. Terrain that is not difficult to manage on ascent may be more hazardous on descent because of fatigue, body mechanics and other factors that may make descending more hazardous than climbing.

23. Between April 25, 2011 and May 8, 2011, the MT-2 expedition moved up Mount McKinley to its high camp location at 17,200 feet where a summit climb would start, if it were to be attempted. On April 26, 2011, the expedition moved from base camp to 7,800 feet where they established Camp 1. By April 29, the MT-2 expedition had reached an elevation of approximately 11,200 feet. On May 1, the expedition began the day at 11,200 feet and climbed to approximately 13,500 feet, just above "Windy Corner" at the 13,200 foot level. At the point they stopped, they created a cache and returned to their camp at 11,200 feet. The expedition stopped on May 1, because of the high winds they were facing. On May 2, 2011 the MT-2 expedition climbed to their Camp 3 at 14,200 feet. It was noted by the guides on the trip that conditions were very icy because there was less snow on the mountain. According to MT-2's lead guide, David Staeheli, the conditions on the mountain were the "second worst conditions ever" based on his 30 years experience on the mountain. The reduced snow conditions on the mountain had previously been reported to Mountain Trip by its first expedition of the year, MT-1, which reported the difficulty of making wind walls to protect tents because of the icy conditions. On May 4, 2011, MT-1 team would retreat from its high camp at 17,200 feet because of the cold temperatures and incessant wind which pushed the wind chill to between -45 to -60 Fahrenheit. High winds continued to be forecast for the upper mountain.

24. Between May 3, 2011 and May 8, 2011, the MT-2 expedition remained camped at Camp 3 at 14,200 feet. On May 3, 2011, the expedition picked up gear cached at 13,500 feet in preparation to caching it at 16,000 feet, above where they were camped. Temperatures were reported to be "very cold" even in direct sunlight. On May 4, a rest day was scheduled. On May

*Estate of Niederer v. Mountain Trip Int'l, LLC,*
Case No. A13-_____

6

5, the expedition conducted training exercises. Also, on May 5, one of the expedition members, David Dacquino left the MT-2 expedition, descending with the MT-1 expedition as it retreated from its high camp. On May 6, the MT-2 expedition was stopped by high winds and remained in camp. On May 7, the MT-2 expedition remained at the 14,000 foot level, unable to climb higher because of a windstorm. On May 8, after a late start due to cold temperatures, the MT-2 expedition established its high camp at 17,200 feet. As described by Mountain Trip, after arriving at the 17,200 foot level, the expedition members "had just enough energy to set up camp and eat a hot meal before everyone tucked into their down sleeping bags for tonight." The plan was to take a rest day on May 9, 2011 with the idea of making a summit attempt on May 10. No summit bid was made on May 10th though the weather was good with clear skies and little or no wind.

25. On May 11, 2011, Mountain Trip's guides decided to make a summit attempt. The forecast called for continued cold temperatures with a high wind warning for late that night. In the parlance of the National Weather Service, a high wind warning means that "hazardous high winds are occurring or expected" and that individuals need to "take precautions to protect life and prevent property damage." Desiring to have the summit team climb the lower part of the summit climb in the sunlight where it would be easier to stay warm, the MT-2 guides delayed the start of the summit climb until after 11:00 A.M., leaving camp at 11:21 A.M. Only four of the remaining MT-2 clients made the attempt to reach the summit. One client, Richard Quintiliani, and one guide, Jack McGee, stayed at high camp.

26. The Mountain Trip summit party left the high camp with two rope teams. Had Mountain Trip complied with its concession requirements, it would have started the summit climb with at least two ensolite pads, two bivouac sacks or sleeping bags (or a combination thereof), two snow saws and two shovels. It would have had more than a single thermos of hot liquid or a stove, fuel and pot in addition to a thermos.

27. MT-2 left high camp without the required ensolite pads, shovels or snow saws. Despite temperatures of -20 Fahrenheit, it brought only a single uninsulated bivouac sack. No

*Estate of Niederer v. Mountain Trip Int'l, LLC*, 7
Case No. A13-_____

stove, fuel or pot was carried. A single thermos of hot liquid was carried. Its contents were incapable of being reheated or replenished with additional hot liquids.

28. Climbing at altitude can be a slow and extremely fatiguing affair, particularly in the cold. The typical time for a climb to the summit and return to high camp is approximately 12 hours. For the MT-2 team, if it climbed at less than the average speed, it would be climbing into the adverse weather conditions predicted.

29. The MT-2 team took approximately 3 hours to reach Denali Pass. On the way, one expedition member, Tony Diskin, sustained frostbite injuries to both hands. Upon reaching Denali Pass, it was determined that Diskin could not proceed further. He and MT-2's assistant guide Henry Munter descended from Denali Pass towards high camp and on to the camp at 14,200 feet, picking up Richard Quintiliani along the way and leaving Assistant Guide Jack McGee in high camp to await the summit party's return. McGee did not have a radio to monitor the progress of the summit party.

30. As a consequence of Diskin's injury and the need to send him down the mountain with Munter, the remaining summit group consisted of Niederer, client Lawrence Cutler, client Jeremiah O'Sullivan and lead guide David Staeheli. At Denali Pass, Cutler was feeling the effects of altitude and not having eaten sufficiently prior to starting. He wondered whether he should continue on, but was encouraged by Staeheli to keep climbing rather than going down with Diskin and Munter.

31. With only one guide, all the clients had to be roped to Staeheli and the group could only move at the speed of the slowest climber. Staeheli continued to observe that Cutler was having a difficult time. Rather than deciding to retreat and try again on another day with the stronger clients, Niederer and O'Sullivan, Staeheli allowed Cutler to choose between stopping and descending, or continuing to ascend. Staeheli suggested that if the team got to an area known as "The Football Field" and Cutler was not feeling better, Staeheli would leave Cutler there, while the remainder of the party climbed to the summit.

32. With all clients tied to Staeheli by a single rope, each climber was exposed to the risk of being pulled off his feet and falling should a team member fall while on steeper terrain. Such

*Estate of Niederer v. Mountain Trip Int'l, LLC,*
Case No. A13-_____        8

risk could be mitigated if the lead climber, Staeheli, placed protection along the route by using snow pickets and anchoring the rope as it passed through. Such a technique is known as a running belay. If a climber falls from above an anchor, the anchor below will catch him if he is unable to arrest the fall before passing it. By placing and using anchors, climbers below the falling climber are protected from the risk of being pulled off the climb by a falling companion and falling themselves. If left in place as the last climber proceeded by on ascent, the pickets would also provide protection on the descent.

33. Slowed by Cutler, at approximately 8:00 P.M., the MT-2 expedition reached The Football Field at an altitude of approximately 19,500 feet and again engaged in a discussion of whether Cutler's pace was delaying the team's progress. They took a rest break there and were passed by an Alaska Mountaineering School expedition that was also making a summit attempt. The AMS expedition had started its summit climb at approximately 11:45 A.M. behind the MT-2 summit teams. It had initially caught the MT-2 summit teams at Denali Pass.

34. At approximately 8:15 P.M., the MT-2 group began their push to the summit ridge approximately 600 feet above The Football Field. To reach the summit ridge, the MT-2 expedition had to climb a 30 to 35 degree slope known as "Pig Hill." Pig Hill's slope becomes steeper the higher one climbs. As the team ascended Pig Hill, Staeheli placed no protection for use either on the ascent or on descent though he had pickets remaining and though he had placed some during the ascent of "the Autobahn" section lower down, though the slope was no steeper. Between 9:30 P.M. and 10:00 P.M. the MT-2 summit team reached the summit ridge.

35. As MT-2 reached the summit ridge, the wind speed which was light lower down increased to 15-20 miles per hour. Though they had already been climbing at altitude for over 10½ hours at the time they made the summit ridge, the MT-2 team continued to ascend even as the wind speed on the summit increased.

36. The AMS expedition reached the summit before 10:00 P.M. and immediately began to descend. At 10:00 P.M., the AMS group passed the MT-2 summit team on the summit ridge. The MT-2 team was 300 yards below the summit and still ascending. The wind was increasing with speeds estimated at 15 to 25 mph and temperatures between -20 degrees and -30 degrees

Fahrenheit. In such temperature and wind conditions, frostbite and hypothermia can occur in scant minutes.

37. The MT-2 summit team finally reached the summit of Mt. McKinley at approximately 10:45 P.M. and remained on the summit for approximately 10 minutes. After taking pictures on the summit, the MT-2 team started down. After traversing the summit ridge, the team started down Pig Hill proximate to the way it had come up. Niederer, the strongest of the client climbers, led the way down. Next on the rope was O'Sullivan followed by Cutler and then MT-2's guide Staeheli. Part way down O'Sullivan fell, was unable to self arrest and, because of the scoured snow conditions, pulled the rest of the team off their feet into a rolling, sliding fall. Because no protection had been placed on the way up Pig Hill, there was none in place on the way down and accordingly the entire team continued to fall some 300 to 500 feet until the slope angle decreased near the bottom. O'Sullivan's leg was broken in the fall and Niederer suffered facial injuries, a suspected shoulder dislocation, and multiple broken ribs. Staeheli too suffered broken ribs and lost a mitten in the fall leading to rapid frost bite of his hand. At the time the fall occurred, the temperature was approximately -30 degrees Fahrenheit and the wind was blowing at 20 to 30 miles per hour.

38. The reason the NPS requires all summit teams to carry a shovel and snow saw is so that in the event of an emergency a team can stay together, dig in and/or construct a shelter, and stay warm, rather than being exposed to the elements. One reason the NPS requires an ensolite pad is to help provide insulation from the snow. The reason to carry a sleeping bag is to insulate an immobilized climber. The reason to carry a stove, pot and fuel, is to be able to generate hot liquid to keep climbers warm and hydrated. The NPS's minimum equipment requirements are intended to increase the chances of survival if a party is caught up in an accident or stranded above high camp on a summit bid or descent.

39. After the fall, Staeheli did not evaluate Niederer's injuries. Without shovel and snow saw, the expedition had no way to dig in or create shelter to keep the expedition together and out of the force of the increasing wind. Without a sleeping bag or ensolite pad, the expedition had no way to insulate O'Sullivan or other party members from the ground and cold temperatures.

Without stove, pot, and fuel to create hot water, the expedition had no way to stay hydrated or warm through drinking warm fluids.

40. As a consequence of not bringing the minimum required equipment, the MT-2 summit party had inadequate means to stay together and protect itself from increasingly hazardous conditions as the wind continued to build.

41. Staeheli or Cutler wrapped O'Sullivan in the non-insulated bivouac sack but it blew away shortly thereafter in the increasing winds. Staeheli tried to call for rescue with a satellite phone but the phone was damaged in the fall or as he attempted to assemble it. Even if a call had been completed, no quick rescue could occur because of the team's location on the high mountain, the time necessary to mobilize a rescue and the weather conditions. To safely await rescue would have required the building of a shelter, which MT-2 lacked the tools for as a result of Mountain Trip's non-compliance with its concession agreement and Park Service requirements. Staeheli gave his heavy parka to O'Sullivan but it too was lost in the wind.

42. After the fall, and while on the lower slopes of Pig Hill, Staeheli asked Cutler to use a small FRS (Family Radio Service) radio to call for help. FRS radios work on a line of sight basis. In order to use the radio to contact either the AMS party or the camp at 17,200 feet, Cutler had to unrope and move towards a feature known as the "Archdeacon's Tower."

43. Cutler's attempt to reach the 17,200' camp by radio was doomed to failure because the remaining MT-2 guide, McGee, did not have a radio with him despite the requirements of Mountain Trips concession agreement.

44. After Cutler unroped he went to Niederer, assisted him with putting on his pack, and the two began to descend towards the Archdeacon's Tower as Staeheli attempted to move O'Sullivan to The Football Field to await rescue by helicopter if one could be summoned. Having moved O'Sullivan as far as he could towards The Football Field, and having given O'Sullivan his heavy parka, Staeheli left O'Sullivan and went to catch up with Cutler and Niederer. Staeheli left the climbing rope on Pig Hill after the fall.

45. Without a heavy parka himself, having given it to O'Sullivan, Staeheli had to move faster than Cutler and Niederer in order to stay warm. He caught up with and then passed them

*Estate of Niederer v. Mountain Trip Int'l, LLC,* 11
Case No. A13-_____

on the Archdeacon's Tower ridge. He told them to wait at Denali Pass at the top of the Autobahn, the steep and extremely hazardous section of climb that begins near the 17,200 foot campsite. Staeheli told them, "If you go on the Autobahn without the rope you could die."

46. Staeheli continued to rapidly descend. He waited for Cutler at another feature, "Zebra Rocks," but did not wait for Niederer before continuing his own descent. Whatever directions Staeheli gave Cutler at Zebra Rocks were not effectively communicated as the two became separated at that point. Niederer was provided no direction on how to descend from Zebra Rocks to Denali Pass.

47. Having left Cutler and having far out distanced Niederer, Staeheli arrived at the MT-2 17,200 foot camp at 3:30 A.M. on May 12, an hour after the AMS party.

48. Cutler made it to Denali pass, attempted to wait for Niederer, but ultimately decided he needed to continue to descend if he were to survive in the cold temperature and wind which had increased to 55 mph or more. After an extremely hazardous descent down the Autobahn, assisted in the end by Mountain Trip's Assistant Guide Jack McGee and Patrick Ormond, the guide for the Alaska Mountaineering School, Cutler made it back to the 17,200 foot level camp at 7:15 A.M. on May 12, 2011.

49. The injured Niederer, who up until the fall was the strongest climber of the clients, was unable to keep up with Staeheli or Cutler. He perished at Denali Pass from exposure to cold temperatures and high winds. O'Sullivan survived with severe frost bite injuries. He was rescued from the Football Field at 7:00 P.M. on May 12, 2011, after the summit winds had died down enough to make high altitude helicopter rescue possible.

COUNT I – Survival Action (AS 09.55.570)

50. Plaintiff incorporates paragraphs 1-49 as though fully set forth herein.

51. Mountain Trip owed a duty of care to Niederer. Mountain Trip's duty of care included conducting its operations in such a manner as to comply with its obligations under its concession agreement with the National Park Service.

*Estate of Niederer v. Mountain Trip Int'l, LLC,*
Case No. A13-_____  12

Case 3:13-cv-00040-RRB   Document 1   Filed 02/25/13   Page 12 of 14

52. Mountain Trip's duty of care required it to put Niederer and other team members' safety ahead of any desire to attain Mount McKinley's summit whether that desire was expressed by Niederer, other clients, or Mountain Trip and/or its guides.

53. The conduct of Mountain Trip as set forth in paragraphs 1-50 was negligent and/or in reckless disregard of duties Mountain Trip owed Niederer as a provider of commercial guide services on Mount McKinley, including the duty to comply with all mandated safety rules for commercial guide services.

54. As a consequence of Mountain Trip's negligent and/or reckless disregard for duties it owed Niederer as a purveyor of commercial guide services, Niederer suffered predeath injury, pain and suffering, and fear of impending death as a result of the fall on Pig Hill and before his death due to exposure at Denali Pass after being abandoned by Mountain Trip. Plaintiff claims all categories of loss permitted by AS 09.55.570.

55. As a result of Mountain Trip's negligent and/or reckless disregard of the duties it owed to Niederer, Niederer suffered damages in an amount greater than $75,000.00, the exact amount to be determined at trial.

## COUNT II – Wrongful Death (AS 09.55.580)

56. Plaintiff incorporates paragraphs 1- 55 as though fully set forth herein.

57. The conduct of Mountain Trip as described in paragraphs 1-56 was negligent and/or in reckless disregard of the duties it owed to Niederer and such negligent and/or reckless misconduct caused in whole or in part the death of Niederer.

58. As a consequence of its negligent and/or reckless disregard of the duties it owed to Niederer, which caused Niederer's death, Mountain Trip caused damages to Niederer's Estate and the beneficiaries of the estate, Sabine Niederer, M. N. and A. N., including but not limited to the:

- Deprivation of the expectation of pecuniary benefits to the beneficiaries that would have resulted from the continued life of Beat Niederer;
- Loss of contribution for support;
- Loss of assistance or services to the beneficiaries;

- Loss of consortium;
- Loss of prospective training and education;
- Funeral expenses.

59. As a result of Mountain Trip's negligent and/or reckless misconduct as set forth herein, the Estate and beneficiaries of the Estate have suffered losses in excess of $75,000.00, the exact amount to be determined by the jury after considering all the facts and circumstances. On behalf of Sabine Niederer, M. N. and A. N., plaintiff personal representative claims all categories of damages permitted by Alaska's Wrongful Death Statute, AS 09.55.580.

## PRAYER FOR RELIEF

60. Wherefore, Plaintiff prays for the following relief:

   a. An award of all damages recoverable by the personal representative on behalf of the Estate under Alaska's Survival Statute, AS 09.55.570, for Beat Niederer's pre-death injury, pain and suffering consequent to the fall on Pig Hill caused by Mountain Trip's negligent and/or reckless misconduct as set forth above;

   b. An award of all damages recoverable by the Estate on behalf of the beneficiaries thereof pursuant to Alaska's Wrongful Death Act, AS 09.55.580;

   c. Interest, costs and attorney fees as provided by law; and

   d. Such other relief as may be available as provided by law or deemed available by the Court.

## JURY DEMAND

61. Pursuant to FRCP 38(b)(1), Plaintiff hereby demands trial by jury.

Dated this 22nd day of February, 2013.

_____
Jeffrey K. Rubin
FRIEDMAN | RUBIN
Attorneys for Plaintiff